A WOMAN'S CHOICE–EAST SIDE WOMEN'S CLINIC; Indianapolis Women's Facility; a Clinic for Women, Inc.; Planned Parenthood of Central and Southern Indiana, Inc.; Fort Wayne Women's Health Organization, Inc.; Ulrich G. Klopfer, D.O.; Women's Pavilion, Inc.; and Friendship Family Planning Clinic of Indiana, on behalf of themselves and their patients seeking abortions, Plaintiffs,

v.

Scott C. NEWMAN, in his official capacity as Prosecuting Attorney for Marion County, and as representative of the class of all prosecuting attorneys in the State of Indiana; and Gregory Wilson, M.D., in his official capacity as Commissioner of the Indiana Department of Health, Defendants.

No. IP 95–1148–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 30, 2001.

Colleen Connell, The Roger Baldwin Foundation of American Civil Liberties Union, Chicago, IL.

Janet Crepps, Center For Reproductive Law and Policy, Simpsonville, SC.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN.

Simon Heller, Center For Reproductive Law & Policy, New York City.

Mary J. Hoeller, White & Raub, Indianapolis, IN.

Jon Laramore, Deputy Attorney General, Indianapolis, IN.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAMILTON, District Judge.

An Indiana law enacted in 1995 requires in almost all cases that at least 18 hours before an abortion can be performed, a woman must be given certain state-mandated information concerning the abortion and alternatives to abortion. See Ind. Code § 16–34–2–1.1. The law specifically requires that medical personnel provide some of this advance information "in the presence" of the pregnant woman. The "in the presence" provision would require most women to make two trips to a clinic in order to obtain an abortion.

Plaintiffs in this case are reproductive health care facilities that provide a range of services related to pregnancy and women's health, including abortions up to 12 weeks of gestation, and a licensed physician who performs abortions. Plaintiffs contend the "in the presence" requirement is unconstitutional because it imposes an undue burden on a woman's constitutional right to choose to end a pregnancy.

The Indiana statute is similar to a Pennsylvania law upheld by the Supreme Court against a facial challenge in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), as well as a Wisconsin law upheld by the Seventh Circuit in *Karlin v. Foust*, 188 F.3d 446 (7th Cir.1999). Both decisions left open the possibility, however, that additional evidence on the effects of such laws could establish an undue burden. In this case, plaintiffs have presented evidence on the effects of such "in the presence" requirements that was not presented to the courts in *Casey* or *Karlin*. The additional evidence shows that Indiana's "in the presence" requirement is likely to impose an undue burden on the ability of many women to exercise their constitutional right to choose to end a pregnancy.

The evidence shows that the burden imposed by the "in the presence" requirement is likely to prevent abortions for approximately 10 to 13 percent of Indiana women who would otherwise choose to have an abortion—roughly 1300 to 1700 per year. Plaintiffs have also shown it is highly unlikely that the effects of the law will result from any persuasive effect the state-mandated information might have. There is no evidence from other states or from Indiana showing that requiring such state-mandated information to be provided to a woman in advance of an abortion (whether in person or otherwise) actually persuades women to choose childbirth over abortion.

Accordingly, as explained below, the "in the presence" provision imposes an undue burden on a woman's constitutional right to choose to end a pregnancy. The court is entering a permanent injunction against enforcement of the "in the presence" requirement, which is severable from the other provisions of Public Law 187. This entry sets forth the court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52. The substance rather than the court's label shall determine whether a matter is a finding of fact or a conclusion of law.

I. *The Indiana Statute*

Indiana has long required physicians performing abortions to obtain the informed consent of their patients, just as they must obtain informed consent for other medical procedures. Informed consent generally requires that the patient be told the general nature of her condition, the proposed treatment or procedure, the expected outcome, the material risks, and the reasonable alternatives to the treatment or procedure. See Ind.Code § 34–18–12–3 (informed consent for purposes of medical malpractice action).

Indiana's "informed consent" requirements for abortions reach well beyond the more general requirements for medical procedures. Abortions in Indiana are criminal unless a number of conditions are satisfied, one of which is that "the woman submitting to the abortion has filed her consent with her physician." Ind.Code § 16–34–2–1(1)(B). Indiana Public Law 187–1995 (referred to here as "Public Law 187") added special mandatory disclosure and waiting period provisions for informed consent for abortions. The law requires in almost all cases that certain medical information and information about alternatives to abortion be provided to a woman orally at least 18 hours before she may have an abortion. Some of the medical information must be provided "in the presence of the pregnant woman." The law was drafted to have gone into effect on September 1, 1995, but it was enjoined from operation first by this court's temporary restraining order and then by this court's preliminary injunction. *A Woman's Choice—East Side Women's Clinic v. Newman,* 904 F.Supp. 1434 (S.D.Ind.1995).

The central provisions of Public Law 187 state:

> An abortion shall not be performed except with the voluntary and informed consent of the pregnant woman upon whom the abortion is to be performed. Except in the case of a medical emergency, consent to an abortion is voluntary and informed only if the following conditions are met:
>
> (1) At least eighteen (18) hours before the abortion and in the presence of the pregnant woman, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25–27.5–2–10), an advanced practice nurse (as defined in IC 25–23–1–1(b)), or a midwife (as defined in IC 27–12–2–19) to whom the responsibility has been delegated by the physician who is to perform the abortion or the referring physician has orally informed the pregnant woman of the following:
>
> (A) The name of the physician performing the abortion.
>
> (B) The nature of the proposed procedure or treatment.
>
> (C) The risks of and alternatives to the procedure or treatment.
>
> (D) The probable gestational age of the fetus, including an offer to provide:
>
> (i) a picture or drawing of a fetus;
>
> (ii) the dimensions of a fetus; and
>
> (iii) relevant information on the potential survival of an unborn fetus; at this stage of development.
>
> (E) The medical risks associated with carrying the fetus to term.
>
> (2) At least eighteen (18) hours before the abortion, the pregnant woman will be orally informed of the following:
>
> (A) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care from the county office of family and children.
>
> (B) That the father of the unborn fetus is legally required to assist in the support of the child. In the case of rape, the information required under this clause may be omitted.
>
> (C) That adoption alternatives are available and that adoptive parents may legally pay the costs of prenatal care, childbirth, and neonatal care.

(3) The pregnant woman certifies in writing, before the abortion is performed, that the information required by subdivisions (1) and (2) has been provided.

Ind.Code § 16–34–2–1.1. Anyone who knowingly or intentionally performs an abortion in violation of these requirements is subject to criminal penalties. Ind.Code §§ 16–34–2–1, 16–34–2–7. The evidence here shows that only a few women are referred to abortion providers by other physicians. See Ex. 25 (approximately four percent of patients in one clinic were referred by outside physician). Thus, the practical effect of the "in the presence" requirement is to require a woman to make two trips to an abortion clinic in order to obtain an abortion.[1]

## II. *Procedural Background*

Plaintiffs filed their complaint on August 24, 1995, asserting that Public Law 187 would impose undue burdens on a woman's constitutional right to choose to end a pregnancy.[2] Defendants are a class consisting of all prosecuting attorneys in the State of Indiana, with Scott C. Newman of Marion County as representative of the class; and the Commissioner of the Indiana Department of Health.[3]

On August 25, 1995, plaintiffs filed a verified motion for a preliminary injunction and expedited hearing, asserting that enforcement of Public Law 187 would cause immediate and irreparable harm. After a hearing on August 30, 1995, the court entered a temporary restraining order enjoining enforcement of the challenged law for ten days. The court also issued an order certifying the defendant class.[4] The parties agreed to a short extension of the temporary restraining order, and the court heard evidence on plaintiffs' motion for a preliminary injunction on October 11–13, 1995. Also on October 13, 1995, defendants filed a motion to certify the interpretation of the medical emergency exception to the Supreme Court of Indiana.

On November 9, 1995, the court issued a preliminary injunction enjoining enforcement of Public Law 187. See *A Woman's Choice*, 904 F.Supp. 1434. The court also granted defendants' motion to certify the interpretation of the medical emergency exception to the Supreme Court of

---

1. Exhibit 25 was considered when the court issued its preliminary injunction. See *A Woman's Choice*, 904 F.Supp. at 1453. Defendants have not sought to revisit the question of this practical effect. Public Law 187 also contains an exception to the disclosure and waiting period requirements when a woman faces a "medical emergency," which is defined to mean: "a condition that, on the basis of the attending physician's good faith clinical judgment, complicates the medical condition of a pregnant woman so that it necessitates the immediate termination of her pregnancy to avert her death or for which a delay would create serious risk of substantial and irreversible impairment of a major bodily function." Ind.Code § 16–18–2–223.5. The Supreme Court of Indiana has construed this language broadly to include any situation in which "the attending physician, in the exercise of her clinical judgment in light of all factors relevant to a woman's life or health, concludes in good-faith that medical complications in her patient's pregnancy indicate the necessity of treatment by therapeutic abortion," including "serious and permanent mental health issues." *A Woman's Choice—*

*East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 111 (Ind.1996) (answering certified questions in this case). Plaintiffs are no longer pursuing their challenge to the medical emergency language of Public Law 187.

2. In their complaint, plaintiffs also challenged an Indiana statute providing that abortions after the first trimester may be performed only "in a hospital or ambulatory outpatient surgical center." Ind.Code § 16–34–2–1(2)(B). Plaintiffs did not request a preliminary injunction against that provision and have not presented evidence concerning it. That claim is dismissed without prejudice.

3. Plaintiffs originally named John C. Bailey as a defendant in his official capacity. Pursuant to Fed.R.Civ.P. 25(d), Gregory Wilson has been substituted as the current Commissioner of the Indiana Department of Health.

4. The court's original order certifying the defendant class invited further consideration of the issue. Neither side has raised the class issue since then.

Indiana. After the state court answered certified questions about the scope of the medical emergency exception, defendants moved to vacate or modify this court's preliminary injunction. On October 14, 1997, this court modified its preliminary injunction. See *A Woman's Choice—East Side Women's Clinic v. Newman,* 980 F.Supp. 962 (S.D.Ind.1997). The state court's construction of the medical emergency exception persuaded this court that the law's enforcement should not be enjoined entirely. However, the court found that the grounds for the preliminary injunction against enforcement of the "in the presence" requirement in Public Law 187 remained valid and that the requirement was severable from the remaining portions of Public Law 187.

The court therefore modified its preliminary injunction to permit enforcement of the waiting period and mandatory disclosure provisions of Public Law 187, concluding that, on the record before the court, plaintiffs were not likely to succeed in showing that the mandatory disclosure and waiting period requirements would impose burdens that would actually prevent a substantial number of women from having abortions they would otherwise choose to have. The court also concluded that plaintiffs were still likely to succeed on their challenge to the "in the presence" requirement. The court therefore also modified its injunction against enforcement of that requirement by directing that the state-mandated information could be provided by telephone.

Plaintiffs now challenge the constitutionality of only the "in the presence" requirement of Public Law 187. The record at this point includes evidence from the earlier stages of this case, a court trial on November 1–2, 1999, and later written supplements to the evidence by both sides. After post-trial briefing and further evidentiary submissions in writing, the court heard additional argument. The issues have been fully briefed and are ripe for decision.

### III. Legal Framework Governing Abortion Regulations

#### A. The "Undue Burden" Standard

"The issue of abortion is one of the most contentious and controversial in contemporary American society. It presents extraordinarily difficult questions that, as the Court recognizes, involve 'virtually irreconcilable points of view.'" *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 2617–18, 147 L.Ed.2d 743 (2000) (O'Connor, J., concurring). Notwithstanding the contention and controversy, some broad principles have been established by the Supreme Court.

■ First, before viability of the fetus, a woman has a right under the United States Constitution to choose to terminate her pregnancy. *Stenberg,* 120 S.Ct. at 2604, citing *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 870, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (controlling joint opinion of O'Connor, Kennedy, and Souter, JJ.).[5]

■ Second, "a law designed to further the State's interest in fetal life which imposes an undue burden on the woman's decision before fetal viability" is unconstitutional. *Stenberg,* 120 S.Ct. at 2604, quot-

---

5. The joint opinion signed by Justices O'Connor, Kennedy, and Souter, and joined in part by Justices Blackmun and Stevens, provided the narrowest grounds for the judgment of the Court on all questions. That opinion therefore states the controlling holdings of the Court. See *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (when no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by the Justices who concurred in the judgment on the narrowest grounds). Accordingly, the Court majority in *Stenberg* and several dissenting justices treated the joint opinion in *Casey* as the controlling statement for the court. See *Stenberg,* 120 S.Ct. at 2604 (majority); *id.* at 2621 (Rehnquist, C.J., dissenting) (citing *Marks*); *id.* at 2625 (Kennedy, J., dissenting); *id.* at 2636 (Thomas, J., dissenting).

ing *Casey*, 505 U.S. at 877, 112 S.Ct. 2791. An "undue burden is . . . shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* The standard has two distinct and independent prongs, based on the purpose of the law and the effect of the law. Either may be sufficient to find an undue burden.

*Casey* and *Stenberg* together establish the "undue burden" standard as the controlling test for evaluating state regulations of abortions. The unadorned language of the undue burden test—determining whether a state law has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus"—does not draw sharp lines on the legal map. This court's task in this case is to apply the undue burden test to the evidence in this case. For purposes of this case, the best guide to the meaning of the Supreme Court's language is the Court's application of the test in *Casey* itself.[6]

At issue in *Casey* were Pennsylvania statutes that required disclosures of state-mandated information to the woman before she could give informed consent; required a woman to wait 24 hours after such disclosures before obtaining an abortion; required a minor to have parental consent prior to obtaining an abortion; and required a married woman to notify her husband before obtaining an abortion.

The controlling joint opinion by Justices O'Connor, Kennedy, and Souter in *Casey* articulated the undue burden standard and then applied it to those statutory requirements. A majority of the Court held that the requirements of mandatory disclosure, a 24–hour waiting period, and parental consent for minors had not been shown to impose an undue burden on women seeking pre-viability abortions. See 505 U.S. at 885–87, 899–900, 112 S.Ct. 2791 (O'Connor, Kennedy, Souter, JJ.), *id.* at 967–71, 112 S.Ct. 2791 (Rehnquist, C.J., joined by White, Scalia, Thomas, JJ.). A different majority of the Court struck down the requirement that a married woman notify her spouse before seeking an abortion because the requirement was likely to prevent a significant number of women from obtaining an abortion. See 505 U.S. at 893, 112 S.Ct. 2791 (O'Connor, Kennedy, Souter, JJ., joined by Blackmun and Stevens, JJ.).

Pennsylvania's spousal notification requirement was the only provision for which the Court found sufficient evidence of an undue burden on a woman's right to choose to terminate a pregnancy. The portion of the joint opinion striking down that requirement therefore provides the surest guide to the type of showing required to meet the undue burden standard in a facial challenge. See *Karlin v. Foust*, 188 F.3d at 480 (acknowledging instructive significance of this portion of *Casey*); see also *Casey*, 505 U.S. at 920 n. 6, 112 S.Ct. 2791 (Stevens, J.) ("The meaning of any legal standard can only be understood by

6. In *Stenberg*, the Court addressed a Nebraska law prohibiting particular surgical methods used in late-term abortions. The Court found that the state law imposed an undue burden in two different respects. First, the law lacked the constitutionally required exception "for the preservation of the life or health of the mother." 120 S.Ct. at 2613. In this case, however, the Supreme Court of Indiana has saved Public Law 187 with respect to protecting the health of the woman by giving an expansive reading to the statutory language of the medical emergency exception. See *A Woman's Choice*, 671 N.E.2d at 111. That application of the undue burden standard in *Stenberg* therefore is not in dispute here. Second, the Nebraska law in *Stenberg* imposed an undue burden by outlawing both the "dilation and evacuation" procedure used most commonly in second trimester abortions, as well as the rare "dilation and extraction" method. 120 S.Ct. at 2613. In fact, Nebraska agreed that if the statute were properly construed to bar both methods, it would impose an undue burden. *Id.* The specific issues in this case are so different from those in *Stenberg* that the Supreme Court's applications of the undue burden standard in *Casey* itself provide more specific guidance.

reviewing the actual cases in which it is applied.").

When the *Casey* Court struck down the spousal notification law, the record did not include statistical evidence of the effects of any similar spousal notification requirements in other states. The record included substantial evidence and findings of fact on the frequency of domestic violence and the role that pregnancy often plays as a flashpoint for such violence against women and their children. See 505 U.S. at 887–92, 112 S.Ct. 2791. The Court also considered "limited research" on spousal notification requirements that involved "samples too small to be representative." *Id.* at 892, 112 S.Ct. 2791. That research also supported findings of fact indicating that, when married women do not notify their husbands of their decisions to have an abortion, in most cases the pregnancy is the result of an extramarital affair or, if the husband is the father, the husband and wife are experiencing marital difficulties, often accompanied by violence. *Id.* The Court concluded that the research and the district court findings "reinforce what common sense would suggest." *Id.* at 892–93, 112 S.Ct. 2791. Although spouses in healthy marriages discuss such important and intimate decisions, "there are millions of women in this country who are the victims of regular physical and psychological abuse at the hands of their husbands. Should these women become pregnant, they may have very good reasons for not wishing to inform their husbands of their decision to obtain an abortion." *Id.* at 893, 112 S.Ct. 2791.

The fact that a law may make abortions more difficult or expensive to obtain does not, the joint opinion in *Casey* emphasized, necessarily show that the law imposes a substantial obstacle. *Id.* at 893–94, 112 S.Ct. 2791. What made the difference for the Court was the evidence supporting the following conclusion about the spousal notification law: "We must not blind ourselves to the fact that the significant number of women who fear for their safety and the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases." *Id.* at 894, 112 S.Ct. 2791.

The defendants in *Casey* argued that the spousal notice requirement could not be an "undue burden" because it would affect only about one percent of women seeking abortions. (About 20 percent of women seeking abortions were married, the evidence showed, and 95 percent of those women notified their husbands on their own.) The Court rejected the argument: "The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects." 505 U.S. at 894, 112 S.Ct. 2791. The Court recognized the target of the legislation as married women seeking abortions who did not wish to notify their husbands of their intentions and who did not qualify for one of the exceptions to the requirement. The Court found that the prospect of domestic violence would mean that, "in a large fraction of the cases in which [the requirement] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. It is an undue burden, and therefore invalid." *Id.* at 895, 112 S.Ct. 2791. The Court did not quantify more precisely the "large fraction" or its denominator.

The portion of the joint opinion in *Casey* addressing the mandatory disclosure and waiting period requirements in the Pennsylvania law is also highly instructive here, of course, especially since the Indiana law was modeled on the Pennsylvania law upheld in *Casey*. The joint opinion recognized that the law would impose some burden on women seeking abortions in terms of increased cost and delay, but the Court was not persuaded that those burdens were so great as to be "undue burdens." See *id.* at 886–87. The Court acknowledged the district court's findings that delays would require two trips to a

clinic, thus increasing exposure of women to "the harassment and hostility" of protesters at clinics, and that "for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24–hour waiting period will be 'particularly burdensome.'" 505 U.S. at 886, 112 S.Ct. 2791, quoting 744 F.Supp. 1323, 1352 (E.D.Pa.1990). The Court described these findings as "troubling in some respects," but inadequate to demonstrate that the waiting period imposed an "undue burden." 505 U.S. at 886, 112 S.Ct. 2791. The Court concluded: "Hence, on the record before us, and in the context of this facial challenge, we are not convinced that the 24–hour waiting period constitutes an undue burden." *Id.* at 887, 112 S.Ct. 2791.

That conclusion in *Casey* left the door open for possible future challenges, such as the one here, to similar state laws modeled after the Pennsylvania statute if parties challenging such laws could come forward with evidence that would meet the "undue burden" standard. See *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 510 U.S. 1309, 1313, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994) (Souter, Circuit Justice) (denying application for a stay of Court of Appeals' refusal on remand to consider additional evidence on the likely effects of Pennsylvania's statute, but noting that "litigants are free to challenge similar restrictions in other jurisdictions, as well as these very provisions as applied"); *Karlin v. Foust,* 188 F.3d at 484 ("We conclude plaintiffs are not precluded from challenging a waiting period provision nearly identical in all respects to the one upheld in *Casey.*").

The parties here have recognized, as the Supreme Court and the Seventh Circuit have taught, that application of the effects prong of the undue burden standard to similar laws could lead to different results in different states. Such different results may occur either because new evidence is presented regarding the actual effects of such laws, or perhaps because of demographic or geographic factors unique to a particular state. Thus, the Supreme Court's decision in *Casey* did not control the validity of a similar law in Wisconsin where different evidence was presented. See *Karlin,* 188 F.3d at 485 (recognizing that *Casey*'s decision to uphold Pennsylvania law did not control constitutionality of Wisconsin law). Nor should the Wisconsin case control the validity of Indiana's law in a case where additional and different evidence has been presented.[7]

### B. *Burden of Proof for a Facial Challenge*

 Plaintiffs have brought a facial challenge to the "in the presence" requirement before it could take effect. In bringing a facial challenge, "a party seeks to vindicate not only [her] own rights, but those of others who may also be adversely impacted by the statute in question." *Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119

---

7. In the *Hope Clinic* opinions, the Seventh Circuit's majority and dissent debated the consequences of conflicting factual findings by two district courts on medical issues related to procedures used in late-term abortions. See *Hope Clinic v. Ryan,* 195 F.3d 857, 873 (7th Cir.1999) (*en banc* ) (stating "that none of the Supreme Court's decisions in abortion cases suggests that the same law would be constitutional in one state, and unconstitutional in another, depending on a district court's resolution of factual disputes"), *vacated,* 530 U.S. 1271, 120 S.Ct. 2738, 147 L.Ed.2d 1001 (2000); *Hope Clinic,* 195 F.3d at 883–85 (Posner, J., dissenting) (addressing problems posed when constitutionality of similar state statutes depends on factual findings of district judges in different cases and arguing that effects of law should be treated as legislative facts rather than adjudicative facts). In *Hope Clinic,* the Court of Appeals was dealing with conflicting findings from two district courts made at essentially the same time on essentially the same medical issues. With respect to "in the presence" requirements, however, the available evidence has been growing over time. This court has before it evidence that was not presented to

S.Ct. 1849, 144 L.Ed.2d 67 (1999). "When a facial challenge is successful, the law in question is declared to be unenforceable in *all* its applications, and not just in its particular application to the party in suit." *Id.* at 74, 119 S.Ct. 1849 (Scalia, J. dissenting) (emphasis in original). In a facial challenge, those challenging an abortion regulation do not have to wait for the law to take effect and cause them harm.

Since *Casey* was decided in 1992, the lower federal courts have debated whether facial challenges to laws regulating abortions should be governed by the "undue burden" standard as the Court actually applied it in *Casey* or by the so-called "*Salerno* standard," which requires a demonstration "that no set of circumstances exists under which the [statute] would be valid." See *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (upholding federal Bail Reform Act against facial challenge under Eighth Amendment). The Court in *Casey* did not expressly overrule or reject the *Salerno* standard, but the Court did not apply the standard in evaluating the facial challenge to Pennsylvania's abortion regulation. The joint opinion in *Casey* found that a woman's right to choose to terminate or continue her pregnancy must be protected from "undue burdens" imposed by a state

regulation. *Casey*, 505 U.S. at 876, 112 S.Ct. 2791. The joint opinion further held that a regulation imposes an undue burden if it operates as a substantial obstacle to "a large fraction" of the women "for whom the law is a restriction." *Id.* at 895, 112 S.Ct. 2791. Applying this standard, the Court struck down the statute's spousal notification requirement, finding that the provision was likely to pose a substantial obstacle to a significant fraction of the women affected by the restriction. *Id.* at 893–97, 112 S.Ct. 2791.

The apparent tension between *Casey* and the *Salerno* standard for facial challenges has resulted in a circuit split regarding the proper standard for facial challenges to abortion regulations. See *Hope Clinic v. Ryan*, 195 F.3d 857, 865 (7th Cir.1999) (*en banc* ) ("Courts of appeals are divided on the question whether *Salerno* applies to abortion legislation."), *vacated*, 530 U.S. 1271, 120 S.Ct. 2739, 147 L.Ed.2d 1002 (2000); *Carhart v. Stenberg*, 192 F.3d 1142, 1149 (8th Cir.1999) ("In considering a challenge to the facial validity of an abortion regulation, we follow the standard set out in *Casey*."), *aff'd*, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743.[8]

In ruling on plaintiffs' motion for a preliminary injunction, this court concluded that "*Casey* effectively displaced *Salerno*'s

---

the district court or the Court of Appeals in *Karlin v. Foust.*

**8.** See also *Planned Parenthood of Southern Arizona v. Lawall*, 180 F.3d 1022, 1025–27 (9th Cir.1999) (reviewing split among lower courts and concluding that *Casey* is the proper standard in the context of facial challenges to abortion statutes), *as amended by*, 193 F.3d 1042 (9th Cir.1999) (amending prior opinion and denying rehearing) (O'Scannlain, J., dissenting from denial of rehearing and criticizing panel for finding that *Salerno* standard no longer applies to facial challenges to abortion statutes); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir.1997) (finding "that *Salerno* is not applicable to facial challenges to abortion regulations" and applying *Casey* standard); *Manning v. Hunt*, 119 F.3d 254, 268 n. 4 (4th Cir.1997) (applying *Salerno* standard of review because the parties did not challenge the district court's ap-

plication of this standard, and noting that the Supreme Court had not expressly overruled *Salerno*); *Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1104 (5th Cir.1997) ("As far as we can tell, the Court appears to be divided 3–3 on the *Salerno–Casey* debate, and it would be ill-advised for us to *assume* that the Court will abandon *Salerno* because three members of the Court now desire that result."), *vacated on other grounds*, *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir.2001) (*en banc*); *Jane L. v. Bangerter*, 102 F.3d 1112, 1116 (10th Cir.1996) (rejecting district court's use of *Salerno* standard and finding "that the proper test after *Casey* is the 'undue burden' standard applied by the Court in that case"); *Barnes v. Moore*, 970 F.2d 12, 14 & n. 2 (5th Cir.1992) (per curiam) (noting that the "*Casey* joint opinion may have applied a somewhat different standard" than *Salerno*, but refusing to "interpret *Casey* as having overruled, *sub silentio*, long-standing Supreme Court precedent" governing facial challenges).

application to abortion laws." *A Woman's Choice,* 904 F.Supp. at 1448, citing *Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1458 (8th Cir.1995) ("We choose to follow what the Supreme Court actually did—rather than what it failed to say—and apply the undue-burden test."). This court adheres to that view, follows what the Supreme Court has actually done in *Casey* and *Stenberg,* and applies the undue burden standard as applied in those cases.

## IV. The Effects Prong of the Undue Burden Test

■ In applying the effects prong of the undue burden test, the question is whether the "in the presence" requirement of Public Law 187 is likely to impose an "undue burden" on Indiana women who seek to have abortions. In terms of *Casey,* would the law operate to place a "substantial obstacle" in the path of "a large fraction" of the women for whom the law operates as a restriction? See 505 U.S. at 895, 112 S.Ct. 2791. The best available guide to answer this question in this facial challenge comes from the post-*Casey* experience in other states that have implemented "two-trip" requirements, as well as from the experience in Indiana and other states that have implemented waiting period and mandatory disclosure requirements without requiring two trips. Mississippi has been studied most closely, but evidence in this record also pertains to Utah, Louisiana, North Dakota, and Indiana itself.

In applying the undue burden test, it is important to distinguish between two factual questions. The first is whether "two-trip" laws have a significant effect on abortion rates and practices. That issue is the subject of extensive statistical evidence and debate. As explained below, the answer is yes. The court finds as a fact that enforcement of the "in the presence" requirement in Indiana, which effectively requires two trips to an abortion clinic, (a) is likely to cause a significant decline of approximately 10 to 13 percent in the rate

for Indiana women having abortions, which amounts to approximately 1300 to 1700 per year; (b) is likely to cause significant increases in travel out-of-state to have abortions; and (c) is likely to cause a significant increase in the proportion of second trimester abortions, which are both riskier and more expensive than earlier abortions.

Proof that the law is likely to cause a decrease in the abortion rate is not sufficient by itself, however, to show that the "in the presence" requirement would impose an undue burden on women. Putting aside for the moment the increase in second trimester abortions and the changes in interstate travel for abortions, if the effect of the law, with its combination of state-mandated information and the required waiting period, were to persuade women to change their minds about whether to have an abortion, that effect would be constitutional under *Casey.* *Casey* upheld the Pennsylvania waiting period and mandatory disclosure law precisely because the state was entitled to take some measures to try to persuade women not to have abortions. See 505 U.S. at 883, 112 S.Ct. 2791.

The second factual issue, therefore, is whether the expected reduction in abortion rates would result from any persuasive effect the law might have, or whether the reduction would result instead from the law posing substantial obstacles for women seeking abortions. That question cannot be answered by examining only the abortion rate statistics in states requiring two trips to clinics. However, states that require mandatory disclosures and waiting periods without requiring two trips have not shown any significant reduction in abortion rates resulting from those requirements. That evidence indicates that such laws have no detectable persuasive effects. There is also a complete lack of any other evidence tending to show that mandatory disclosures and waiting periods have any persuasive effect. In addition, the evidence shows that a two-trip law is likely to increase the number of women

leaving the enacting state to obtain abortions in other states and to decrease the number of women from other states coming to the enacting state to have abortions, and to increase the frequency of later abortions. The sum of this evidence, and the absence of evidence of any persuasive effect, shows convincingly that the predicted reduction in abortion rates would result not from persuasion but from restrictions posing a substantial obstacle for some women's ability to obtain abortions.

Accordingly, the court further finds as a fact that the likely effects of the "in the presence" requirement would not be the result of any persuasive effect of the state-mandated information or the required waiting period. The likely effects would instead result from the burdens that the "in the presence" requirement would impose on women. The court explains next the evidence supporting these findings on the reduction in rates and other effects of the law, as well as the reasons for the reduction.

### A. Effects of "In the Presence" Requirements on Abortion Rates

#### 1. The Evolution of the Data

The parties have submitted extensive evidence relevant to the effects prong of the undue burden test. In a sense, the litigation process has produced an ongoing dialogue among expert statisticians and judges in this case and in *Karlin v. Foust*. From the outset of this case, plaintiffs have relied primarily on Dr. Stanley Henshaw, a statistician with the Alan Guttmacher Institute. After this court's preliminary injunction decision in 1995, Dr. Henshaw also testified in the case challenging the similar Wisconsin law in *Kar-*

*lin.* The State of Wisconsin in *Karlin* relied on Dr. Peter Uhlenberg, a professor of sociology at the University of North Carolina, to criticize and rebut Dr. Henshaw's work. Judge Crabb reviewed the work of both experts in her decision. See *Karlin,* 975 F.Supp. at 1215–18.

Judge Crabb relied on Dr. Henshaw's data and analysis to find that the Mississippi two-trip that took effect in 1992 law caused a statistically significant reduction in the rate of abortions for Mississippi residents. *Id.* at 1217. However, Judge Crabb was not convinced by the evidence offered in that case that the reduction was caused by burdens the law imposed rather than by a possible persuasive effect. *Id.* at 1217–18. The Seventh Circuit did not disturb either finding. See 188 F.3d at 487. Thus, one way of looking at the present case is that it turns first on whether Indiana and its experts have undermined the basis for expecting the "in the presence" requirement to cause a reduction in the abortion rate, and second, if not, it turns on whether plaintiffs have come forward with sufficient evidence in this case to enable this court to reach a reliable conclusion about whether the reduction would result from persuasive effects or from burdens on women seeking abortions.

For the trial of this case, both Dr. Henshaw and Dr. Uhlenberg refined and supplemented their work. At trial the state also offered evidence from Dr. Lee Jen Wei, a professor of biostatistics at Harvard. At each step of the process, the dialogue has gone a step or two further as Dr. Henshaw and Dr. Uhlenberg (with the fresh support from Dr. Wei) have responded to criticisms from one another and from the courts.[9] This process continued even

***

9. For example, in *Karlin* Dr. Uhlenberg had criticized Dr. Henshaw's preliminary study for using some data from 1993, after the Mississippi law took effect, to make seasonal adjustments in calculating an expected rate of abortions. See *Karlin,* 975 F.Supp. at 1216; see also *A Woman's Choice,* 904 F.Supp. at 1456 (addressing similar criticism raised by

defense witness at preliminary injunction stage of this case). That criticism was mooted by Dr. Henshaw's further work, which avoided use of the 1993 data for any seasonal adjustment. Similarly, Dr. Uhlenberg was criticized in *Karlin* for excluding from his Mississippi calculations data from July and August 1992 on the theory that some women

beyond the trial as the court held the record open for further submissions of written evidence from Dr. Henshaw and Dr. Uhlenberg.[10]

As a result of this ongoing process of analysis, this court cannot assume that the courts' and the experts' earlier adoptions of or criticisms of Dr. Henshaw's and Dr. Uhlenberg's findings are still valid. As shown below, for example, in response to very specific criticisms of his study of Mississippi's experience, Dr. Henshaw has conducted further analyses to test those criticisms. The court now turns to the evidence concerning several states, beginning with Mississippi.

### 2. Dr. Henshaw's Mississippi Studies

After *Casey* was decided in June 1992, a similar Mississippi law took effect on August 8, 1992. The law requires a woman seeking an abortion to receive certain information in person at least 24 hours before the abortion. Dr. Henshaw and colleagues studied abortion data from Mississippi and other states to evaluate the effects of the law on women seeking abortions. The results of that study were published in the Journal of the American Medical Association in 1997. Ex. 224 ("JAMA article"). That study was more detailed, precise, and reliable than the preliminary study presented to this court

in 1995 as part of the preliminary injunction proceedings. See 904 F.Supp. at 1454–55. (It also appears that the JAMA article may not have been available to the Seventh Circuit in *Karlin v. Foust.* The court's opinion in *Karlin* refers to a study of the number of abortions performed in Mississippi in the seven months before the law took effect and five months after it took effect, see 188 F.3d at 486, which was the preliminary study this court also considered. See Ex. 3.) The analysis in the JAMA article used both a time series model looking at the twelve months before and the twelve months after the law took effect, and regression analyses using data from the three years before the law took effect and the two years after. The JAMA article also introduced comparisons to Georgia and South Carolina for both the time series and the regression analyses.

The Mississippi study in the JAMA article shows that when the twelve months before and after the new Mississippi law took effect are compared: (1) the total rate of abortions for Mississippi residents (regardless of where they were obtained) decreased by approximately 16 percent; (2) the proportion of Mississippi residents traveling to other states to obtain abortions increased by approximately 37 percent; and (3) the proportion of second trimester abortions for Mississippi resi-

---

might have accelerated their scheduling of abortions to anticipate the effective date of the law in August 1992. See *Karlin*, 975 F.Supp. at 1216–17 (court found method "suspect for excluding both July and August"). Dr. Uhlenberg's new calculations in this court included the data from both months, mooting that earlier criticism.

**10.** The court invited further evidence from both sides because, at the close of trial, the record in this case was simply silent on one factual matter that had received considerable attention from both the district and appellate courts in *Karlin*—whether the (reported) closing of one abortion clinic in southern Mississippi in 1992 undermined the reliability of Dr. Henshaw's analysis of the Mississippi data. See *Karlin*, 188 F.3d at 487 (addressing combined effect of clinic closing and missing data from Louisiana); *Karlin*, 975 F.Supp. at 1216.

The parties submitted additional evidence after trial in the form of short supplemental depositions from Dr. Uhlenberg and Dr. Henshaw to address this factual issue and its potential effect on Dr. Henshaw's overall analysis. Dr. Uhlenberg's deposition exhibits contained an affidavit from another lawsuit in which the doctor who operated the clinic in Gulfport stated that the clinic was closed for ten months in 1992. Ex. 377 ¶ 10. There is also conflicting evidence about whether that doctor performed more abortions than were reported. See Uhlenberg Supp. Dep. 19. The net result of that additional evidence, as discussed below, shows that Dr. Henshaw's overall analysis remains valid. The same effects were observed in Mississippi when the southern counties were excluded from consideration altogether.

dents increased by approximately 40 percent. Ex. 224 at 655. (The state's expert Dr. Uhlenberg replicated these results, but criticized their reliability for reasons discussed below. See Ex. 301 ¶ 9.)

To test the significance of these changes, Dr. Henshaw and his colleagues compared the Mississippi data to data from Georgia and South Carolina, which did not impose similar changes in their abortion laws. All three states are southern states and had comparable abortion laws, apart from the law being evaluated. All three also had relatively reliable abortion data, including data from neighboring states under reciprocal agreements. Thus, the authors could account for women who left their home states to have abortions in neighboring states. See Ex. 224 at 654. The authors also noted that all three states had large non-white populations, which allowed race-specific analysis of data. *Id.*

The time series analysis showed that Mississippi residents obtained 16 percent fewer abortions in the twelve months after the law took effect as compared to the twelve months before. Abortions during that same period declined by three percent in Georgia and by five percent in South Carolina. Ex. 224 at 655 (Table 1). By comparing the changes in rates, the researchers found that the decrease in Mississippi was 14 percent as compared to Georgia and 12 percent as compared to South Carolina. The confidence intervals for the Mississippi changes as compared to the changes in the other states showed that the changes in Mississippi were statis-

tically significant, meaning they were unlikely to have resulted from random fluctuations. *Id.*

The researchers also broke down the data for all three states by age and race. The declines in Mississippi rates were greatest for white adults and white teenagers, indicating decreases of 24 and 22 percent respectively. Ex. 224 at 656 (Table 2). The decline for non-white adults in Mississippi was smaller, and there was no decline for non-white teenagers.

The increase in second trimester abortions in Mississippi also withstood comparison to the other states. Georgia and South Carolina experienced essentially no change in the rate of second trimester abortions. The rate in Mississippi increased by a very substantial 40 percent. The difference was statistically significant. Ex. 224 at 655 (Table 1), 657.

In addition to the comparison of rates in the twelve months before and after the Mississippi law took effect, Dr. Henshaw and his colleagues also conducted regression analyses for the abortion rates in Mississippi, South Carolina, and Georgia, using data from January 1989 through December 1994. The regression analyses showed that overall abortion rates declined between 10 and 13 percent in Mississippi after the two-trip law took effect, as compared to South Carolina and Georgia. Ex. 224 at 656 & Table 4. The decrease was statistically significant.[11] When results were broken down by age and race, the decrease in Mississippi was greater for

---

**11.** The changes were found to be statistically significant, meaning that the observed changes were highly unlikely (probability of less than 0.05) to have been the result of random fluctuations in the measured variables (*i.e.*, the "null hypothesis"). In the JAMA article, Dr. Henshaw and his colleagues measured "rate ratios" and gauged statistical significance by estimating "95 % confidence intervals" for their results. Ex. 224 at 654 and tables. In essence, if the 95% confidence interval (shown in parentheses in the tables of the JAMA article) does not include the value 1.00, then the likelihood that the null hypothesis could account for the observed results is less than 5%. See generally Federal Judicial Center, Reference Manual on Scientific Evidence 123–29 (2d ed.2000) (discussing statistical significance and confidence intervals). Defendants have not challenged directly the methods by which Dr. Henshaw and his colleagues determined statistical significance, so there is no need for the court to delve into issues concerning the proper tests of statistical significance, such as those mentioned in *Mister v. Illinois Central Gulf Railroad Co.*, 832 F.2d 1427, 1430–31 (7th Cir.1987). Of course, defendants challenge Dr. Henshaw's findings on many other grounds, which are discussed in detail below.

white adults and white teenagers than for all women. Results from the regression analyses for non-whites were consistent with the results of the twelve-month before/twelve-month after comparison but were not statistically significant by themselves. Ex. 224 at 656.

In the JAMA article, Dr. Henshaw and his colleagues reached the conclusion that the Mississippi two-trip law caused a statistically significant reduction in the rate of abortions for women residing in Mississippi. That conclusion is consistent with Judge Crabb's finding in *Karlin* based on the preliminary data. 975 F.Supp. at 1217.

In the JAMA article, Dr. Henshaw and his colleagues tested a number of alternative explanations for the decrease in abortion rates that they observed in Mississippi. They considered whether the decrease was part of a long-term trend of declining abortion rates in Mississippi. In fact, however, there was no such trend. Abortion rates had risen significantly in Mississippi in the years before the law took effect. Dr. Henshaw also examined data showing a two percent nationwide drop in abortion rates, which was not sufficient to account for the much larger decrease in Mississippi. See Ex. 205 ¶ 2(f). Dr. Henshaw also considered whether changes in prices or the number of providers of abortions could explain the decrease. He found no support for those explanations, *id.*, which is important in light of the reported closing of a clinic discussed in the *Karlin* opinions. He also found no significant change in the number of women of childbearing age in Mississippi. *Id.* Furthermore, by including in the JAMA article the comparison of Mississippi's experience to experience in South Carolina and Georgia, Dr. Henshaw and his colleagues also provided a further means for accounting for other trends and factors that might have affected abortion rates in Mississippi and those other states. See Ex. 224.

### 3. *Criticisms of Dr. Henshaw's Mississippi Studies*

Defense experts Dr. Uhlenberg and Dr. Wei both opined that the evidence did not show the Mississippi two-trip law had any statistically significant effect on abortion rates. The court considers first Dr. Uhlenberg's criticisms and then Dr. Wei's. Consideration of the defense experts' numerous criticisms requires delving into some fairly intricate statistical and data quality issues.

Dr. Uhlenberg criticized Dr. Henshaw's Mississippi study because many out-of-state abortions for Mississippi women (especially in Louisiana) were not reported and included in the data. Ex. 301 ¶ 9. In writing the JAMA article, however, Dr. Henshaw and his colleagues made adjustments on the generous assumption that 1,000 abortions per year for Mississippi women in Louisiana were not reported to Mississippi state officials for inclusion in the data. See Ex. 224 at 654 (referencing estimate). They still found a 10 percent decrease in abortion rates for Mississippi residents attributable to the law, which was still statistically significant. Tr. at 52 (Henshaw). In the JAMA article Dr. Henshaw and his colleagues also tested the sensitivity of their conclusions to changes in out-of-state abortions. They assumed for purposes of argument that there was an increase in travel to Louisiana for abortions equal to the sum of increase in travel to Alabama and Tennessee. Under that generous assumption, the overall drop in abortion rate would be 13 percent instead of 16 percent, but still statistically significant. Ex. 224 at 657; see also Ex. 206 ¶ 24 (same).

In response to Dr. Uhlenberg's criticism, Dr. Henshaw also ran additional analyses of the data in which he excluded southern Mississippi counties. Dr. Henshaw took this approach because any missing data from Louisiana and any data problems resulting from inaccurate reports from, or the closing of, a particular clinic in southern Mississippi would have had their greatest effects on data on abortions obtained by residents of those counties.

When the data Dr. Uhlenberg had criticized were excluded entirely from the analysis, Dr. Henshaw found comparable statistically significant results for the effect of the law in the rest of the state. Henshaw Supp. Dep. 10–13, 26 & Exs. 255 & 256. Thus, the criticisms based on possible data problems from Louisiana or the accuracy of reports from the southern-most counties in Mississippi do not undermine Dr. Henshaw's conclusions.

As a further test of Dr. Henshaw's methods and conclusions, Dr. Uhlenberg tried to determine whether he could show a similar statistical effect attributable to a random month, not tied to enactment of Mississippi's two-trip law. Specifically, Dr. Uhlenberg selected June 1992 for his test, which was two months before the two-trip law took effect and in which there was an unusual one-month decrease in reported abortions in the Mississippi state data. Using Dr. Henshaw's regression calculations, Dr. Uhlenberg found a significant drop as of June 1992. Tr. 123. Dr. Uhlenberg speculated that a change in Mississippi standards for abortion clinics effective in June 1992 might have affected the number of reported abortions. *Id.*

The criticism is not persuasive. Dr. Henshaw noted that if the change of law had a significant effect in August 1992, one would also expect to detect a statistically significant effect with respect to other months close in time to August 1992. The reason is simply that, when data are compared over a significant period of time, a shift of one or two or three months may not be large enough to dilute the measured effect. See Tr. 42–43, 54 (Henshaw); Ex. 206 ¶ 27.

In addition, Dr. Uhlenberg's speculation about the effects of a change in clinic standards affecting the overall rate of reported abortions was based primarily on a legal dispute involving one abortion provider who operated a clinic in Gulfport, along the coast of the Gulf of Mexico in southern-most Mississippi. See Ex. 300 ¶¶ 22–23; Uhlenberg Supp. Dep., *passim.* Dr.

Uhlenberg's reliance on that situation is not supported by the evidence.

First, Dr. Uhlenberg's information about that situation consists of conflicting affidavits from two sides in a bitter lawsuit in Mississippi. Neither Dr. Uhlenberg nor this court can make a reliable assessment of the credibility of either side's view of the facts in that case. See Uhlenberg Supp. Dep. 37 (admitting he could not tell who was telling the truth in the dispute); *id.* at 44–45 (same).

Second, and more compelling for present purposes, Dr. Henshaw analyzed the Mississippi data without taking into account the southern-most counties in Mississippi. For purposes of that analysis, he assumed Dr. Uhlenberg was right in doubting the reliability of the data from those counties. Dr. Henshaw's analysis excluding those counties again showed a substantial statistically significant decline in the rest of the state. Henshaw Supp. Dep. 10–13 and Exs. 255 & 256.

Third, Dr. Henshaw also looked more closely at Dr. Uhlenberg's hypothesis that the clinic standards law might account for a drop in the abortion rate in June 1992. Dr. Henshaw examined county-by-county reports of abortions from Mississippi for the period 1990–1993, which are in the record as Exhibits 250, 251, 252, and 253 to his supplemental deposition. Based on his review of those reports, Dr. Henshaw found two months—April 1991 and June 1992—for which there appeared anomalies best explained as reporting errors, both in DeSoto County (adjacent to Memphis, Tennessee). For the years 1990 to 1993, the reports show that residents of DeSoto County generally obtained 10 to 20 abortions per month with a few months above or below that range. The report for June 1992, however, shows zero abortions that month for residents of DeSoto County and a substantial drop in abortions for women from other states. See Ex. 252 (reporting 10 abortions in May for DeSoto County residents, zero in June, and 17 in July;

reported abortions for out-of-state residents were 180 in May, 42 in June, and 171 in July).

To account for those errors, Dr. Henshaw compared abortion numbers in June 1992 for the entire state, for the northern counties, and for the state without the northern counties, and he compared June 1992 to Junes of 1990, 1991, and 1993. The results, shown in Exhibit 257, reflect a dramatic fluctuation in the northern counties from a high of 141 abortions for residents of those counties in June 1991, down to a low of 45 in June 1992 (a 68 percent drop), and an increase to 83 in June 1993 (an 84 percent increase over 1992).[12] These problems in the data for June 1992 tend to undermine Dr. Uhlenberg's hypothesis that the change in clinic standards actually accounted for any observed reduction in the abortion rate.[13]

Even more important, however, because the data problems would give pause to any cautious researcher, Dr. Henshaw tested his regression methods and analysis if both the northern-most and the southern-most counties were excluded. He still found a substantial statistically significant drop in abortion rates resulting from the two-trip law in August 1992. He also tried excluding the data from both April 1991 and June 1992 in his calculations, in light of the reasons for doubting the accuracy of the two reports for those months. When those months were excluded entirely, Dr. Henshaw found even larger statistical effects for the two-trip law. Henshaw Supp. Dep. 23–26; Ex. 256 (Regression 2) (coefficient of absolute number of abortions changed from −91.18 to −115.68, and p-value changed from 0.0263 to 0.0046); see also Henshaw Supp. Dep. 12–13 (explaining meaning of coefficients and p-values). Thus, Dr. Henshaw ran to ground those criticisms by Dr. Uhlenberg, and he showed convincingly that they did not affect the overall reliability of his conclusions.

These additional studies are important because they are new. Not only do they address Dr. Uhlenberg's criticisms, but they address the principal problem identified by Judge Crabb and the Seventh Circuit in *Karlin v. Foust* with respect to whether the two-trip law caused abortion rates in Mississippi to decrease. The Seventh Circuit noted in its opinion that Dr. Henshaw's initial study was compromised by the combination of missing data from Louisiana and a problem resulting from either the closure of "the sole abortion facility" in southern Mississippi in early 1992 or that clinic's failure to report abortions for some period. See *Karlin*, 188 F.3d at 487 (closed); *Karlin*, 975 F.Supp. at 1216 (either closed or stopped reporting). Dr. Henshaw's further analysis here

---

12. As this example indicates, the data from Mississippi and other states are not perfect. Experts on both sides had to make some judgment calls about anomalous data that may not have been accurate. As another example, the report for April 1991 shows 117 abortions for residents of DeSoto County, up from 23 in March 1991. Ex. 251. The same table also shows, however, a similar one-month drop in the number of out-of-state residents having abortions in Mississippi, from 191 in March 1991 to 116 in April 1991. The most reasonable explanation of that anomaly is that abortions performed in DeSoto County on women from Tennessee were reported inaccurately as abortions on residents of DeSoto County. See Henshaw Supp. Dep. 16–17.

13. Also, additional data on changes in the stage of pregnancy when abortions were performed and the number of Mississippi women

obtaining abortions out-of-state also coincide with August 1992. Those results tend to undermine Dr. Uhlenberg's hypothesis of a June 1992 effect. Exhibit 209 shows that, before August 1992, the percentage of abortions performed on Mississippi residents past eight weeks gestation was about 44 percent (on an unweighted basis). Beginning in August 1992, that percentage jumped to about 53 percent. Exhibit 210 shows that, before August 1992, the percentage of abortions that Mississippi residents obtained in other states was averaging about 19 percent (on an unweighted basis). Beginning in August 1992, the average jumped to about 25 percent. These changes as of August 1992 are consistent with the other effects of the Mississippi law that Dr. Henshaw and his colleagues observed.

shows that even if one excludes the southern-most counties from the analysis—where the effects of missing Louisiana data and the closure of a clinic in Gulfport would obviously be greatest—the overall effect of the two-trip law in August 1992 remains substantial and statistically significant.[14]

Dr. Uhlenberg also tested Dr. Henshaw's conclusions by studying birth rates in Mississippi. If the Mississippi two-trip law had the effect of preventing abortions, one would expect to see an increase in the number of births in the state, all other things being equal. Dr. Uhlenberg found no such increase. Ex. 300, ¶¶ 14–16. Although this criticism of Dr. Henshaw's analysis has some superficial appeal, it is not persuasive. The abortion rate is much lower than the birth rate in Mississippi. See, *e.g.*, Ex. 201 at 6 (in 1992, Mississippi had 177 abortions for every 1000 live births). Thus, a 10 to 13 percent decrease in the abortion rate would be expected to produce a much smaller percentage change in the birth rate. In addition, some proportion of the pregnancies would end in miscarriages in any event, although Dr. Uhlenberg made an adjustment for that fact. Ex. 300, Table 5. Also, Dr. Uhlenberg concentrated his analysis on births to unmarried white women in Mississippi. See Ex. 301, ¶¶ 2–5. (Dr. Henshaw's data indicated the law had stronger effects on white women than on non-white women, and abortions were much more common among unmarried women than among all women. See Ex. 201 at 22 (in 1992, 85 percent of abortions in Mississippi were performed for unmarried women). Thus, any effect on the birth rate should have been most readily observable among unmarried white women.) By looking for changes in births to unmarried white women, however, Dr. Uhlenberg did not account for the proportion of single pregnant women who marry before they give birth. The evidence indicated that the proportion would be about 29 or 30 percent. See Tr. 373. In addition, Dr. Uhlenberg developed his projected number of births from comparisons to birth rates in neighboring states that simply did not correlate well with Mississippi's birth rate at times other than those being examined and was not a reliable basis for the projection. Tr. 45–46. In fact, Exhibit 240 shows a small but noticeable increase in births among unmarried white women between 1992 and 1994.

Dr. Henshaw and his colleagues also looked at birth rates as part of their study reported in the JAMA article. Looking at the relevant time period, they observed that birth rates declined in Mississippi, South Carolina, and Georgia, but the decline was the smallest in Mississippi. The data on birth rates were inconclusive, but they were not inconsistent with the hypothesis that the Mississippi law caused an increase in the number of unintended pregnancies carried to term. See Ex. 224 at 657–58; see also *id.* at 655 (Figures 1 & 2 and Table 1).

Thus, when adjustments are made for miscarriages and for marriages before the birth of a baby, the predicted change in the birth rate is small compared to the degree of random fluctuations in birth rates. As a result, random fluctuations could easily mask such effects of changes in the abortion rate. See Ex. 206 ¶ 28. The birth data are not inconsistent with

14. Both the Seventh Circuit and Judge Crabb also pointed out that Dr. Henshaw's preliminary study of Mississippi did not take into account a possible persuasive effect of the law. That issue is considered below. The threshold issue at this stage of the analysis is whether the law in fact produced a substantial drop in the abortion rate in Mississippi. Despite the criticism based on missing Louisiana data and the clinic in Gulfport, Judge Crabb found the law had such an effect in Mississippi. *Karlin*, 975 F.Supp. at 1217. The Seventh Circuit did not take issue with that finding. See *Karlin*, 188 F.3d at 487. In this case, however, with the evidence from Dr. Uhlenberg and Dr. Wei, Indiana has launched an attack on the threshold issue: whether the two-trip law had any effect at all in Mississippi.

Dr. Henshaw's conclusions. The absence of a detectable effect in the birth rate does not undermine the validity of Dr. Henshaw's finding that the Mississippi two-trip law caused a statistically significant reduction in the rate of abortions.

Dr. Uhlenberg also criticized Dr. Henshaw's conclusions because of the different results found for whites and non-whites in the Mississippi data. As noted above, Dr. Henshaw and his colleagues found greater decreases in abortion rates for whites in Mississippi. The decrease for non-white adults as shown through the regression analyses was smaller and not statistically significant by itself. There was no decrease for non-white teenagers. See Ex. 224. Dr. Uhlenberg used annual data for non-white women in Mississippi and found a slight increase in the number of abortions for that group after the Mississippi law took effect, although that result may well be an artifact of the particular time periods chosen, which used longer time periods and introduced more potentially confounding variables. See Ex. 300 ¶¶ 9–13 & Table 4. Dr. Uhlenberg found no apparent explanation for the different results by race, and he argued that this anomaly undermines Dr. Henshaw's analysis and tends to show the decrease observed by Dr. Henshaw was an artificial phenomenon rather than a true effect of the Mississippi law. See also Tr. 116.

Dr. Henshaw and his colleagues had also considered the issue of race. In the JAMA article, they wrote that the differences by race were "more difficult to interpret." Ex. 224 at 657. They suggested two possible explanations in the article, but neither is especially persuasive. It is clear, however, that there are substantial underlying differences by race with respect to both birth rates and abortion rates in Mississippi. Figure 2 of Exhibit 224 shows, for example, birth rates of 85 to 90 births per 1000 non-white women, but 58 to 62 births per 1000 white women. Figure 1 shows abortion rates of 14 to 17 abortions per 1000 non-white women, but 8 to 11 abortions per 1000 white women. With differences that large in these underlying rates, the differences in measured effects by race do not undermine the conclusion that the law had significant effects on the overall rate of abortions.

Dr. Wei agreed with Dr. Uhlenberg on some of the criticisms discussed above. He also added some criticisms of his own and carried out some statistical analyses that persuaded him that the Mississippi data do not show a statistically significant decline in the abortion rate attributable to the two-trip law taking effect.

Dr. Wei criticized Dr. Henshaw for failing to take account of "the declining national trend in the number of abortions." Ex. 303 ¶ 5. However, Dr. Henshaw's use of South Carolina and Georgia as comparator states in the JAMA article provided a reasonable means for accounting for such changes. See Ex. 224 at 656–58. In addition, Mississippi had experienced increases in its relatively low abortion rate while the national average rate was declining slightly. The modest downward national trend does not undermine Dr. Henshaw's conclusions.

Dr. Wei also criticized Dr. Henshaw for failing to account for changing beliefs regarding abortion. See Ex. 303 ¶ 5. Again, however, the use of comparator states provided a mechanism for accounting for such changes (if they had actually occurred) on a national or regional level. Moreover, Dr. Wei and the defendants have not come forward with any actual evidence of such changes at any relevant times. It is always possible to imagine other possible confounding factors. Without some reason to believe the factors are real, the mere possibility does not undermine Dr. Henshaw's results.

Dr. Wei also cited an article by Meier and others that he described as providing "scientific evidence that state-level restrictions have no effect on the incidence of abortion." Ex. 303 ¶ 6, citing Meier, *et al., The Impact of State–Level Restrictions on*

*Abortion,* 1996 Demography 307. Dr. Wei seriously overstated the conclusions of that article, which is in the record as Exhibit 328. The Meier paper studied 23 separate state policy actions in the wake of *Webster v. Reproductive Health Services,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). The authors found no evidence that the policies they studied had an appreciable impact on abortion rates. Ex. 328 at 311. The authors recognized, however, as Dr. Wei did not, that their findings did "not refute the possibility that state policies can affect the rate of induced abortions." *Id.* They also recognized that state Medicaid policies affect abortion rates. The authors did not purport to have come forward with "scientific evidence that state-level restrictions have no effect on the incidence of abortion," without qualification.

Even more relevant for this case, Meier and his colleagues also recognized the importance of the *Casey* decision. They cited "early anecdotal or case analysis" suggesting that the waiting period and mandatory disclosure laws have an effect. *Id.* The authors also suggested more systematic study of the effects of such laws as later data became available. *Id.* Dr. Henshaw's JAMA article is precisely such an effort, and it provides substantial proof of such effects.

Dr. Wei also identified a number of additional possible confounding and intervening variables, including changes in abortion pricing, levels of anti-abortion activity "perceived as harassment" at clinics, negative publicity, the quality of services, changed service availability, the reputation of providers, the scope and funding of abstinence programs, the scope and availability of services providing alternatives to abortion, differences in geographic proximity of abortion services, misreporting and underreporting of abortion data, changing laws on abortion facilities, changes in Medicaid financing for abortion, and alterations in reimbursement for abortions by private insurance carriers. Ex. 303 ¶ 7. Dr. Wei claimed: "None of these were accounted for by Dr. Henshaw in examining the impact of Mississippi's waiting period and informed consent law."

Plaintiffs have objected to Dr. Wei's testimony on these points, arguing that he is not qualified to offer an admissible expert opinion on the topic of potential confounding factors affecting studies of abortion rates. Dr. Wei had not studied abortion rates or the subject of abortion more generally before he began working on this case. However, he is experienced in statistical analysis in a wide range of areas relating to human health and medical practice. He testified that when he begins to do statistical work in a new field (independent of litigation work, which is a small part of his work), he immerses himself in the literature of the field to help him get a feel for what sorts of factors are most likely to affect and possibly to obscure the data. The court credits that testimony and overrules plaintiffs' objections to Dr. Wei's testimony on that score. Plaintiffs' criticism goes to the weight of his testimony, not its admissibility. However, Dr. Wei's testimony on potential confounding factors is entitled to little weight.

Dr. Wei's criticism of Dr. Henshaw for failing to account for potential confounding factors simply is not accurate. As noted above, Dr. Henshaw and his colleagues considered many of these factors, and they used methods designed to minimize and control for such effects. For example, they considered changes in prices, changes in the number of providers, and changes in the population of women of child-bearing age. They found no significant changes in these factors. In addition, they used comparisons to Georgia and South Carolina, which share important similarities with Mississippi, as a useful control for other factors, including those that might have affected abortion rates more broadly. As for the other potential confounding factors identified by Dr. Wei, there is simply no evidence that any of these factors changed

in Mississippi during the time period studied by Dr. Henshaw.

Dr. Henshaw and his colleagues made a reasonable and serious effort to account for likely confounding variables. Their effort was easily sufficient to render their analysis relevant and admissible. See generally *Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *Adams v. Ameritech Services, Inc.,* 231 F.3d 414, 422–28 (7th Cir.2000) (reversing district court finding that statistical reports were inadmissible). It is almost always possible for someone disappointed with the results of statistical analysis to hypothesize one more independent variable that might explain the results. Such a bare hypothesis is not sufficient to undermine the analysis. See *Allen v. Seidman,* 881 F.2d 375, 380 (7th Cir.1989) (defendant's "attack on the plaintiffs' statistical case amounts to a contention that unless a plaintiff eliminates all alternative hypotheses he must lose. That would raise the threshold of proof too high."). Dr. Wei and the defense have had ample time and incentive to find evidence that any other material changes occurred during the relevant time period in Mississippi. They have not come forward with such evidence. Cf. *Mister v. Illinois Central Gulf Railroad Co.,* 832 F.2d 1427, 1431–33 (7th Cir.1987) (noting importance of taking relevant variables into account, but plaintiffs proved discrimination where employer failed to conduct appropriate analysis to support its theory that distance from work sites explained apparent racial bias in hiring data). While the proponent of the analysis must make reasonable efforts to account for relevant explanatory variables, he need not anticipate and refute every hypothesis the opponent might dream up. Unsupported speculation about other possible confounding variables is not a sufficient basis for discounting the significance of Dr. Henshaw's analysis.

Dr. Wei himself wrote that an "examination of the above variables is warranted." Ex. 303 ¶ 8. If such an examination was warranted, Dr. Wei and the defense did not carry out such an examination, beyond those items raised by Dr. Uhlenberg and addressed above. Moreover, Dr. Wei's own statistical analyses were carried out in a way that introduced several genuine confounding factors. He failed to follow his own advice to take them into account.

Dr. Wei criticized Dr. Henshaw for using the twelve months preceding the two-trip law in Mississippi because "the number of abortions in 1991 was extremely high," leading Dr. Wei to describe 1991 as an "outlier year" not appropriate for comparison. The number of abortions in Mississippi in 1991 showed a 10.7 percent increase over 1990. Ex. 303, Table 3. However, there is evidence that a new abortion clinic opened in southern Mississippi in 1991, see Ex. 206 ¶ 20, which is precisely the sort of potential confounding factor that all three experts recognize should be taken into account (and a factor that Dr. Henshaw addressed in detail in his supplemental deposition). In addition, the trend over several years in Mississippi had been a significant increase in abortion rates, which had started out and remained well below the national average. See Ex. 201 at 3, 6 (national abortion rate of 23 to 24 per 1000 women aged 15–44, while Mississippi rate was only 12 per 1000 women aged 15–44 in 1992). Given the combined effect of that long-term trend and the change in provider availability in southern Mississippi in 1991, Dr. Wei's criticism of Dr. Henshaw for focusing on the twelve months before and after the effective date of the law is not persuasive.

In addition, there are substantial reasons for examining a fairly short period of time for purposes of the comparison. As Dr. Wei acknowledged, there are many potential confounding variables in this analysis, including long-term trends and changes in abortion providers and avail-

ability. The longer the period that is examined, the greater potential there is for such confounding effects, as indicated, for example, by the change in providers in 1991.

Dr. Wei also criticized Dr. Henshaw for failing to attempt a survey of affected women to assess the impact of the law. He said this failure rendered Dr. Henshaw's conclusions "speculative at best." This criticism is naive and completely unfounded. Dr. Henshaw, who is thoroughly acquainted with the challenges of doing research related to abortion and abortion policy, explained for the record the obvious practical and ethical problems involved in doing the type of survey Dr. Wei proposed. These problems include confidentiality issues and the difficulty in even finding women who might have contacted a clinic anonymously, learned of the requirements, and changed their minds, let alone the difficulty in obtaining reliable answers from a woman after the birth of a child about why she might have chosen not to have an abortion early in the pregnancy. See Tr. 362–64 (Henshaw); see also Tr. 282 (Wei acknowledging "logistical problems" and recognizing that such a survey would be "very difficult"); Tr. 309 (Wei acknowledging there are areas of social science research where true experiments with human subjects would be unethical).

Dr. Wei carried out his own analysis of data from Mississippi. In his principal analysis, he compared monthly abortion rates from August 1992 to December 1992 with the same months from 1988, 1989, 1990, and 1991. That is, he compared August 1992 to the Augusts of the four previous years, September 1992 to the Septembers of the four previous years, and so on for Octobers, Novembers, and Decembers. Using these comparisons, he found no statistically significant decrease in abortion rates for 1992 after the two-trip law took effect.

Dr. Wei's use of the Wei–Johnson method for analyzing time-series data may be useful in many situations, but its use as applied to the Mississippi data is not persuasive. Most important, Dr. Wei's method suffers from the very flaws for which he incorrectly criticized Dr. Henshaw—the failure to account for other confounding variables, especially long-term trends in Mississippi and changes in provider availability. See Tr. 376 (Henshaw criticism of Wei–Johnson method as applied). Also, by comparing only monthly data, which involve quite a bit of random fluctuation at the statewide level, Dr. Wei reduced his sample sizes and introduced more potential for "noise" in the statistical results. See Tr. 376. If the Mississippi two-trip law did have a significant effect on abortion rates when it took effect in August 1992, Dr. Wei's methods were custom-tailored to hide that effect in statistical noise created by both the long-term trends and the greater degree of fluctuation from month to month than is present from year to year.

Although Dr. Wei brought impressive credentials to this case, some of his testimony further diminished his credibility in general and more specifically with respect to his reliance on his Wei–Johnson method in this case. For example, in defending his approach to time-series data, Dr. Wei used a comparison to the stock market. He asserted that it would be easier for him to predict the price of IBM stock next year than to predict the abortion rate in Mississippi next year, supposedly because he had more data points over the years for the IBM stock price. Tr. 287; see also Tr. 356–57. With all due respect to Dr. Wei, the court cannot credit that testimony, and it impaired his credibility overall.[15]

---

**15.** For example, one recent published report of IBM stock price as of February 10, 2001, showed a 52–week high of $134.94 and a 52–week low of $80.06. Even if one assumed the Mississippi rate of abortion had purely random swings on an annual basis of 10 to 13 percent (the magnitude of the effect Dr. Henshaw observed ), anyone who finds it easier to predict a stock price based on past data than

More directly pertinent, Dr. Wei also impaired his credibility by signing and submitting an affidavit that exaggerated and misstated his conclusions. In Paragraph 2 of his report, Dr. Wei stated under oath:

> For the reasons enumerated below, I believe that Senate Bill 311 is unlikely to cause any unusual delay to Indiana women in obtaining abortions resulting in an increase in second trimester terminations, unlikely to prevent women from obtaining the abortions they desire, unlikely to expose them to any unusual adverse health risks, and unlikely to especially harm low-income women.

Ex. 303 ¶ 2. That strong form of his conclusions—not only that Dr. Henshaw had not proven his own conclusions, but that in fact the contrary was true and the law is unlikely to have adverse effects for women—is not supported by Dr. Wei's own testimony or his explanations directed toward the Mississippi data. In Paragraph 8, for example, Dr. Wei said he could "neither verify Dr. Henshaw's conclusions nor rule out changes in Mississippi's abortion rate due to possible other factors identified above." At trial, however, during questioning by the court about the contrast between these two views, Dr. Wei backed away from the strong assertions of Paragraph 2 and conceded that he could not say the law would have no impact. Tr. 353–54.

Dr. Wei also evaluated how the Mississippi and Utah two-trip laws affected the timing of abortions in those states. He found small increases in the annual means for the week of gestation for abortions in those states. See Ex. 303 ¶ 20 & Figure 9 (also including Louisiana, which did not show a change from its already higher level). He found increases that he described as "clinically insignificant." This comment again shows Dr. Wei's lack of familiarity with the relevant considerations in dealing with abortions. The change in the mean week of gestation is not the

to predict a statewide abortion rate should be

clinically relevant consideration. What is clinically most significant is the shift of an abortion from late in the first trimester to early in the second trimester, when the procedure becomes more expensive and more complex, and carries higher medical risks. That is what Dr. Henshaw considered, and Dr. Wei did not challenge those results.

Dr. Wei also looked at abortion complication rates, which were available for Mississippi and Utah. He found no significant differences. Ex. 303 ¶ 21 & Table 2. However, the sample sizes were so small as to render the comparison meaningless. An abortion complication rate of 0.0013 in Mississippi in 1990–91 amounts to eight to ten such cases per year in the state. An abortion complication rate of 0.0015 in Utah in 1994 and 1995 amounts to only four or five such cases per year in that state. See Ex. 202; Ex. 300, Table 3 (annual number of abortions in Utah); Ex. 303, Table 3 (annual number of abortions in Mississippi).

In sum, Dr. Uhlenberg's and Dr. Wei's criticisms of Dr. Henshaw's Mississippi studies did not undermine the strength of Dr. Henshaw's conclusions about the effects of the Mississippi two-trip law.

### 4. The Utah and Louisiana Experiences

Dr. Uhlenberg questioned Dr. Henshaw's conclusions about the Mississippi data because Dr. Uhlenberg looked at data from both Utah and Louisiana before and after those states adopted similar mandatory disclosure and waiting period laws that require two trips to a clinic. Dr. Uhlenberg found no significant decline in abortions in either state, let alone declines that could be attributed to enforcement of the new laws. The absence of such effects in those states, Dr. Uhlenberg opined, suggested that Dr. Henshaw's finding of an effect in Mississippi was spurious. The parties presented extensive evidence on Utah and somewhat less on Louisiana.

very wealthy.

The Utah law took effect in 1996 and requires an in-person visit with an abortion provider or a referring physician 24 hours before the abortion takes place. The law thus has essentially the same practical two-trip requirement as the Indiana law's "in the presence" requirement. Dr. Uhlenberg considered data from both before and after the Utah law took effect. The law took effect in mid–1996, and Dr. Uhlenberg had only annual data, not monthly data, so he compared annual totals for 1995 and 1997. He found "no unusual decline in the number of abortions to residents of Utah in the period following the implementation of the law in Utah." Ex. 300 ¶ 6. Dr. Uhlenberg found a decline of 4.9 percent from 1995 to 1997, which amounted to an annual decline that he said was "about the same as the annual percent decline in abortions in the U.S. in recent years." *Id.*, ¶ 7(a). Dr. Uhlenberg also found no significant change in the proportion of abortions occurring in the first trimester. *Id.* ¶ 7(b), and Table 3. Dr. Uhlenberg viewed the Utah data as weighing against Dr. Henshaw's opinions on the likely effects of such "two-trip" laws.

On closer examination, however, the Utah experience tends to support plaintiffs. It certainly does not support the defendants. The principal reason is that Utah's population has been growing rapidly. In evaluating the likely effects of a two-trip requirement, therefore, the absolute number of abortions is not as probative as the *rate* of abortions among women of child-bearing age. Adjusting for the population increase, the rate of abortions per 1000 women aged 15–44 for abortions performed in Utah on Utah residents *declined* by 9.3 percent from 1995 to 1997, the period that Dr. Uhlenberg studied. See Ex. 206 ¶ 13; Tr. 37 (Henshaw). That change was statistically significant. The probability of a chance fluctuation of that magnitude was less than .001. In addition,

from 1995 to 1997, there also was a 33 percent decrease in the number of women coming from other states to Utah to obtain abortions. Ex. 206 ¶ 16. That change is also consistent with the experience in Mississippi, where there was a similarly dramatic decrease (approximately 30 percent) in the number of women coming from other states after the two-trip law took effect. Ex. 205 ¶ 2(e).[16]

At trial, Dr. Uhlenberg objected to Dr. Henshaw's reliance on abortion rates in Utah because that approach did not take into account the age-distribution of women of child-bearing age. See Tr. 187–91. For example, if the growth in population were skewed more heavily toward older women in the range, who have relatively few abortions, the results would be less meaningful.

Dr. Uhlenberg's attack on Dr. Henshaw's treatment of the Utah data is not persuasive. It was yet another example of the defense raising an objection or criticism without appropriate follow-through. Cf. *Allen v. Seidman*, 881 F.2d 375, 380 (7th Cir.1989) (discounting defense criticism of plaintiffs' statistical evidence when not supported by appropriate test of the criticism); *Mister v. Illinois Central Gulf Railroad Co.*, 832 F.2d 1427, 1432–33 (7th Cir.1987) (discounting defense hypothesis for statistical evidence where defense did not actually test the hypothesis with available data). First, Dr. Uhlenberg's rebuttal did nothing to justify his own reliance on absolute numbers without taking any account of the change in population. Second, Dr. Uhlenberg did not attempt himself the sort of age-normalization test that he said would provide the best test. Third, in response to Dr. Uhlenberg's criticism, Dr. Henshaw actually did check the age distribution of the growth in Utah population. He found no disproportionate increase among older women, and he found a significant increase in population among

**16.** Less information was available with respect to Utah residents traveling to other states to obtain abortions, apparently as a result of the lack of effective reciprocal reporting agreements. See Tr. 38 (Henshaw) ("I have no data on Utah residents that went to some of the neighboring states.").

younger women, who tend to have more abortions. Tr. 384–85.

The Utah data are not as detailed as those from Mississippi, but when the proper adjustment is made for the growth of the population, the Utah data are consistent with Dr. Henshaw's findings with respect to Mississippi. The two-trip requirement is associated with a statistically significant and substantial decrease in the abortion rate. It is also associated with a sharp drop in the number of women coming to Utah from other states to have abortions.[17]

Dr. Uhlenberg also studied data from Louisiana, which imposed a two-trip requirement that took effect September 25, 1995. Dr. Uhlenberg found no discernible effect on the abortion rate in Louisiana. Using data from the Louisiana state government, Dr. Uhlenberg found slight declines in the numbers of abortions performed when comparing the twelve months before the law took effect to the twelve months afterwards (1.3 percent decline), and when comparing 1994 to 1996 (2.3 percent decline). Ex. 300 ¶ 3. Dr. Uhlenberg did similar comparisons using data from the Alan Guttmacher Institute (AGI). Those data showed an increase of 8.4 percent in the number of abortions in 1996, after the law took effect, as compared to 1992. Ex. 300 ¶ 4. At first glance, those data support defendants' view.

Dr. Henshaw testified that Louisiana data on abortions are not reliable enough to measure accurately a law that would have the effect of reducing abortion rates by 10 percent. Tr. 36. The unreliability is shown by substantial differences between the results of AGI surveys of abortion providers in Louisiana and the state's own data, which generally reflect a lower number of abortions. See Ex. 206 ¶ 4 & Table 1 (AGI survey of providers found

abortion numbers 22 and 20 percent higher than official state data in 1995 and 1996); see also Ex. 300, Tables 1 & 2 (data used by Dr. Uhlenberg). Those large differences are strong indications that the statewide totals for Louisiana simply are not reliable enough to detect changes on the order of 10 or 15 percent. Also, the AGI data were not available for Louisiana for 1993 and 1994, the last two full years before the law took effect. The evidence from Louisiana does not undermine Dr. Henshaw's conclusions.

> 5. *The Statistical Evidence Shows Significant Effects on Abortion Rates, Interstate Travel for Abortions, and Delays of Abortions*

After considering the statistical evidence submitted by both sides, the court finds that the Mississippi two-trip law: (a) caused a decrease in the abortion rate for Mississippi residents of approximately 10 to 13 percent, (b) caused a significant increase in the number of Mississippi residents who traveled to other states to obtain abortions, (c) caused a significant decrease in the number of residents of other states who traveled to Mississippi to obtain abortions, and (d) caused women to delay having abortions, resulting in a significant increase in the number and rate of second trimester abortions for Mississippi residents, which are more dangerous and more expensive. Those findings are generally consistent with the preliminary data from Utah, when properly focused on abortion rates, although the Utah data on travel are less complete and reliable. The different results from Louisiana do not undermine those conclusions, in the court's view, because the statewide data from Louisiana are not reliably precise enough to support conclusions either way.

The next question is whether those results in Mississippi provide a reasonable

---

17. The percentage of abortions performed in the second trimester in Utah increased from 7.5 percent in 1995 to 8.4 percent in 1996. Dr. Henshaw described that change as a 12 percent increase in the incidence of such abortions, but he described the change, which involved quite small numbers, as only "nontrivial," not as statistically significant. See Ex. 206 ¶ 15; Tr. 37 (Henshaw); Ex. 300 ¶ 7(b).

basis for predicting estimated results in Indiana. The court finds that they do provide such a reasonable basis. There is no reason on this record to expect the experience to be significantly different. In the JAMA article, Dr. Henshaw and his colleagues suggested that the large decline in abortion rates they observed in Mississippi might not occur in states with greater availability of abortion providers both within the state and among neighboring states. Ex. 224 at 658. Indiana has a larger population and a larger number of abortion clinics, so that overall, clinics are more conveniently available to women in Indiana than to women in Mississippi. See Exs. 305–316. However, the Mississippi results did not correlate at all with distance or geography, see Tr. 64–65, which indicates that something other than a change in mere convenience is at work here.

Dr. Henshaw found the effects of the two-trip law were greater for white women in Mississippi than for non-white women. The available data for Indiana, from 1995, show that 71.7 percent of abortions performed in Indiana were for women identified as white and 23.7 percent for women identified as black. Ex. 203 at 56. In Mississippi, by comparison, 36.1 percent of abortions were for women identified as white and 62.8 percent for women identified as black. Perhaps that difference could weigh in favor of a greater impact in Indiana, but one cannot say with any reasonable certainty that such a greater effect is likely. See Tr. 34 (Henshaw noting possibility but not opining as to likelihood). The higher proportion of white population in Indiana might or might not tend to produce a greater effect, but there is no reason to expect a smaller effect.

Dr. Henshaw found, contrary to his expectations, that the observed decrease in the abortion rate could not be correlated to distance or economic status. The defendants have argued that that evidence undermines his theory of causation. The court does not view the evidence that way. First, when dealing with expert witnesses in litigation, credible testimony that the expert did not find what he expected to find is a breath of fresh air. In addition, plaintiffs in this case need to show an undue burden. They do not need to show definitively the precise mechanism by which such an undue burden would result from the law.[18]

---

18. The absence of correlation with distance or economic status suggests that the effects of the two trip law may be more closely tied to the same considerations and types of relationships the Supreme Court considered when it struck down Pennsylvania's spousal notice law in *Casey*. Plaintiffs in this case provided substantial evidence about behavior of men and women in abusive relationships. Dr. Connie L. Best is a psychologist with expertise in domestic violence. She provided an affidavit at the preliminary injunction phase of the case in which she testified that men who subject women to violence and abuse often subject them to surveillance and use other tactics to keep them under control. Best Aff. ¶¶ 10–19, 36–49 (Ex. 3 to Pls. Motion for Prelim. Inj.). She also testified that men who abuse their wives or partners often escalate the abuse when the woman becomes pregnant. Such behavior makes it very difficult for some abused women to make even one trip to an abortion clinic, let alone two. The result of the two-trip requirement may be that the man learns of the woman's plan to have an abortion. Best. Aff. ¶¶ 37–45.

Dr. Best's affidavit does not show by itself that the two-trip requirement in Indiana will in fact impose an undue burden on a significant number of women, but it provides a reasonable explanation for how a two-trip requirement could prevent a significant number of women from exercising their right to choose to have an abortion. Moreover, that real possibility in many cases is one of the principal foundations for the Supreme Court's decision in *Casey* to strike down the spousal notification law. See 505 U.S. at 888–95, 112 S.Ct. 2791 (detailing evidence of domestic violence and effects on women's practical ability to choose to have abortions). As the Supreme Court explained:

For the great many women who are victims of abuse inflicted by their husbands, or whose children are the victims of such abuse, a spousal notice requirement enables the husband to wield an effective veto over his wife's decision. Whether the prospect of notification itself deters such women from seeking abortions, or whether the husband, through physical force or psychologi-

For the reasons set forth above, the court finds that the effects of Indiana's "in the presence" requirement are likely to be equivalent to the effects of the similar law in Mississippi—an abortion rate reduced by 10 to 13 percent, a significant increase in the proportion of second trimester abortions, a significant increase in the number of Indiana residents traveling to other states to have abortions, and a significant decrease in the number of residents of other states traveling to Indiana to have abortions.

### B. *"Persuasive Effect" v. Burdens*

The finding that the Indiana law is likely to cause a significant decrease in the abortion rate does not show, by itself, that the law will impose an undue burden. From that starting point, the critical issue is whether such a decrease is likely to be caused by burdens the law imposes on women seeking an abortion or by persuasive effects that the state-mandated information and the waiting period might have in causing women to choose not to have abortions. That was the pivotal issue in *Karlin* on which plaintiffs' case failed. See 188 F.3d at 487–88 ("most significant shortcoming" in Mississippi study was failure to control for persuasive effect); 975 F.Supp. at 1217–18 (plaintiffs failed to show absence of persuasive effect). Such a law was upheld in *Casey* because a legislature may require that information that is truthful and not misleading be provided to better inform a woman's choice, and possibly to persuade her not to have an abortion she would otherwise choose to have. See 505 U.S. at 885, 112 S.Ct. 2791.

Based on the evidence in this case, the court finds that the likely effects of the Indiana "in the presence" requirement will

not result from any such persuasive (and thus constitutional) effect. The effects will instead result from the substantial obstacles the law creates for a substantial fraction of women who seek to have abortions.

At the closing argument in this case, the court asked counsel for defendants to direct the court's attention to any evidence tending to show that a mandatory disclosure/informed consent law with a waiting period has a persuasive effect—*i.e.,* that the information and the time to consider it persuade women to change their minds about whether to have an abortion. The state's response was that testimony from a witness from Planned Parenthood showed that giving the information over the telephone caused an *increase* in the "show rate" for his organization's clinics, thus indicating the startling result that the state-mandated information tends to persuade women to have *more* abortions than they otherwise would. See Tr. 50–52 (May 19, 2000), citing Tr. 12–14. Counsel observed: "That's the only persuasive effect that we've seen demonstrated by either side in the record." Tr. 50 (May 19, 2000).

The court agrees with that candid observation. After years of litigation, with ample opportunity and incentive for defendants to come forward with such evidence, there is simply no evidence in this record tending to demonstrate that mandatory disclosure/informed consent and waiting period laws can accomplish the persuasive purpose deemed constitutional in *Casey.*

The court does not mean to suggest that the burden of proof on this issue is on defendants. Plaintiffs have come forward with evidence from several sources tending to show the absence of any persuasive

---

cal pressure or economic coercion, prevents his wife from obtaining an abortion until it is too late, the notice requirement will often be tantamount to the veto found unconstitutional in [*Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) ]. The women most affected by this law—those who most reasonably fear the consequences

of notifying their husbands that they are pregnant—are in the gravest danger.
*Id.* at 897, 112 S.Ct. 2791. The practical effect of a two-trip law for some women is likely to be the same as the effect of a spousal notice law—disclosure to a spouse or partner that the woman seeks to have an abortion, followed by additional abuse or other efforts to prevent the abortion.

effect from the information that is provided. That evidence has not been rebutted.

In roughly chronological order, plaintiffs offered evidence at the preliminary injunction stage about the experience in North Dakota, where a mandatory disclosure/waiting period law took effect in 1994. The North Dakota law allowed the information to be provided by telephone, so only one trip was required. The director of the only clinic in North Dakota testified that only one or two percent of women who are given the mandated information over the telephone ask for copies of written materials that must be offered. Pr. Inj. Tr. 268. She testified that no patient had ever told her she was cancelling an appointment because of the information. *Id.* at 269. In addition, she saw no decrease in the number of abortions provided. *Id.* at 269–70; see also Ex. 29 (summary statistics). If the state-mandated information and waiting period had any persuasive effect, then one might reasonably expect data from North Dakota to show a sign of it. There is no such sign.[19]

In Indiana itself, the mandatory disclosure and waiting period law took effect in November 1997, subject to the proviso that the information could be provided by telephone. See *A Woman's Choice,* 980 F.Supp. at 974–75. Plaintiffs in this case then established procedures and mechanisms for that information to be provided to a woman who has scheduled an appointment for an abortion. The evidence at trial in this case indicates no change in the so-called "show rate," the proportion of women who schedule appointments who actually come to the clinics as scheduled. See Ex. 226. Overall abortion numbers for Planned Parenthood of Central and Southern Indiana increased after the law became effective, notwithstanding a $25 price increase. Ex. 227; see also Tr. 13–14. Again, if the state-mandated information

and waiting period were having any persuasive effect on those women who receive it, one might reasonably expect the Indiana data to show a sign of it. And again, there is no such sign.

In addition, the evidence that a two-trip law is likely to increase the number of women from such a state who travel across state lines to obtain an abortion tends to weigh against any persuasive effect. Dr. Henshaw found that the proportion of Mississippi residents who traveled to other states to obtain abortions increased by about 37 percent. Ex. 224 at 655. (For purposes of comparison, the same proportion for South Carolina women dropped slightly. See *id.* The change in Mississippi was statistically significant.) For a significant proportion of women, a two-trip law makes one trip to a clinic in another state a better choice than two trips to a clinic in their home state. That phenomenon cannot be attributed to any persuasive effect. There is no indication that mandatory disclosure and waiting period laws that require only one trip to a clinic produce similar increases in out-of-state abortions.

Other evidence on changes in interstate travel for abortions also tends to show the absence of a persuasive effect. After the two-trip law took effect, the number of women from other states traveling to Mississippi for abortions decreased by about 30 percent. The data from Utah showed a similar decrease of 33 percent in travel from other states to Utah for abortions. Those changes are statistically significant, they are attributable to the laws taking effect, and they have not been explained by any hypothesis other than the burdens of the two-trip requirements. That evidence also tends to show that the effects of the law in reducing overall abortion rates cannot be attributed to persuasion.[20]

---

**19.** At the preliminary injunction phase of the case, defendants criticized the North Dakota data as "crude." The court invited further analysis, see *A Woman's Choice,* 904 F.Supp. at 1458 n. 17, but none was provided.

**20.** The evidence of changes in interstate travel patterns also suggests that the observed changes in abortion rates in Mississippi and Utah do not fully reflect the burdens that two-trip laws would impose if enacted by several

It is of course always possible to generate one more hypothesis or to conduct one more study. The court therefore cannot say it would be impossible for the Indiana law to have a persuasive effect. At the time of trial in this case, however, the legal importance of such an effect and the potential value of evidence of such an effect had been part of this case for four years. The state and its experts have had ample opportunity to look for such evidence in several states where waiting period and mandatory disclosure laws have been in effect. They have not found and offered any such evidence. The absence of such evidence is a powerful indicator that those laws do not have a persuasive effect.[21]

In *Karlin v. Foust*, the Seventh Circuit observed that "every post-*Casey* facial challenge to a waiting period requirement substantially similar to the one upheld in *Casey* has been found constitutional." 188 F.3d at 486. In support, the court cited two decisions upholding North Dakota and South Dakota laws, but neither law required two trips to a clinic. See *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1467 (8th Cir.1995); *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 533 (8th Cir.1994). The Seventh Circuit also cited in *Karlin* the Fifth Circuit's decision in *Barnes*, 970 F.2d at 15, which upheld the Mississippi two-trip requirement before the state had experienced its

effects (which were studied in this case). The Seventh Circuit also cited a district court decision in Utah that was reversed on other grounds. See *Utah Women's Clinic, Inc. v. Leavitt*, 844 F.Supp. 1482, 1494 (D.Utah 1994), *rev'd in part on other grounds*, 75 F.3d 564 (10th Cir.1995). The Utah district court decision offers little guidance on this issue at this time. The Utah law was actually construed to require only one trip, so that information could be provided by telephone. See 844 F.Supp. at 1487, 1495. The district judge offered the correct observation that the Supreme Court had upheld a two-trip requirement in *Casey*, but there is no indication that the court considered evidence of actual experience under a two-trip law, which provides the type of evidentiary foundation that *Casey* recognized could be used to challenge such a law. See 844 F.Supp. at 1487–88, 1490. Further, the district court decision was not reviewed on the merits.[22]

Thus, *Karlin* remains the only post-*Casey* decision upholding a two-trip requirement where the challenge was based on evidence of women's actual experience under a two-trip law. The evidence in this case and in *Karlin* shows that such laws are likely to cause statistically significant reductions in the rate of abortions, on the order of approximately 10 percent or a little more, allowing for variations among different states. See 975 F.Supp. at 1217

adjacent states. When neighboring states do not require two trips, residents of a state with a two-trip law may choose to avoid some burdens of the law by crossing a state line. In other areas of constitutional law, however, the courts evaluate the effects of a state law based on the assumption that many or all other states may enact similar laws. See, *e.g.*, *Healy v. The Beer Institute*, 491 U.S. 324, 336–37, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Armco Inc. v. Hardesty*, 467 U.S. 638, 644, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984).

21. The court is not relying on Dr. Henshaw's report of conversations with two clinic directors in Mississippi as support for the finding that the law's effects are the result of burdens rather than persuasion. That reliance has been the subject of considerable debate in this case. See 904 F.Supp. at 1458–

62. There is ample support for Dr. Henshaw's opinion on this point apart from those conversations.

22. On appeal, the Tenth Circuit dismissed as untimely the appeal on the merits, but remanded the district court's award of fees against the plaintiffs. 75 F.3d 564. After the district court again imposed fees after that remand, the Tenth Circuit conclusively reversed the fee award. 136 F.3d 707 (10th Cir.1998). After the district court construed the Utah law in 1994 as requiring only one trip to a clinic, the law was amended to require the advance information to be provided "in a face-to-face consultation." The enforcement of that amendment beginning in 1996 was the change studied by Dr. Henshaw and Dr. Uhlenberg in the discussion of Utah data in Part IV–A–4, above.

(finding as a fact that law caused reduction in abortion rate). The additional evidence in this case, not offered in *Karlin*, goes further to show that the reduction in the rate of abortions and the other important effects of the law (delays in abortions and changes in interstate travel) are not at all likely to result from any persuasive effect the mandated information and waiting period might have.

The evidence in this case also goes well beyond what was found sufficient in *Casey* to show that a spousal notification requirement would impose undue burdens on some women's right to choose to end their pregnancies. The reasonable conclusion from this evidence, then, is· that Indiana's "in the presence" requirement would impose a substantial obstacle for a sizable number of women who seek abortions. The effect of the requirement would impose an undue burden on their constitutional right to choose to end a pregnancy.

## V. The "Purpose" Prong of the Undue Burden Test

The Supreme Court taught in *Casey* that a law imposes an undue burden on a woman's right to choose if it was enacted for the purpose of placing a substantial obstacle in the path of a woman seeking an abortion. 505 U.S. at 877, 112 S.Ct. 2791. Plaintiffs contend that the "in the presence" requirement of Public Law 187 has no legitimate purpose and was enacted to place a substantial burden on a woman's right to choose. Defendants argue that the Indiana legislature reasonably could have concluded that "sound medical practice" required a medical professional to assess fetal age and the risks of the abortion procedure in person. Def. Post-trial Br. at 18–19.

During the legislative session leading to enactment of Public Law 187, the Indiana legislature preserved an unusually detailed history of the legislative process, including audio tapes of the House floor debates, relevant portions of which were transcribed for the record. As introduced and passed by the Indiana Senate, the legislation required only that the mandatory disclosure be made "orally" to the pregnant woman. The language requiring that information be provided "in the presence of the pregnant woman" was added by a floor amendment in the Indiana House of Representatives. Debate on the amendment was brief. Initially, the sponsor of the amendment explained the result of the words he proposed but not his underlying reasons for requiring the information session to be conducted in person:

[A]ll my amendment does is on page 2, line 22, after the word "abortion" it inserts "and in the presence of the pregnant woman" so it's very clear that the information will be given to the pregnant woman in person and not by telephone. That information can be given to her by her family doctor or by the clinic. It just simply requires that it be given in person and I would appreciate your support. I might add, Mr. Speaker, there's some confusion about the language that presently is in the bill whether the information can be given over the telephone or not and this would clear that up and make it very clear that it should be, it will be given in the presence of the woman and not by telephone or some other conveyance.

Ex. 38 at 3. Then a member spoke in opposition to the amendment .and raised some of the same objections that plaintiffs have raised here:

Some people have referred to the bill itself as the women—women are stupid bill. This amendment is the women are really stupid amendment and I don't mean that as offensively to [the sponsor of the amendment]. I really feel that very sincerely. Because now we're saying that not only do we have to have this informed consent as if a woman hasn't thought this through, we're saying that if she calls in and talks to the physician and hears all the options and is given the option of seeing the pictures that people want her to see or the informa-

tion that she has to receive, that she's not capable of understanding that over the telephone. This is clearly an effort to make the woman have to go into the clinic, to have to go through all the protesters, and to alert those protesters that she'll be back in 18 hours, we'll know exactly who she is, we'll know exactly why she's back, it gives them the second chance. I mean if we can have informed consent, we can have the bill as it is now with the language in it that requires the informed consent, that requires her to have to call in and get that, all the information and all the graphic descriptions that you want to give, if that's what you so choose, but we don't have to have her go into the facility twice in order to receive that information. I would ask that you reject this amendment.

*Id.* at 3–4. Another member spoke in opposition:

I've had a test, biopsy if you will, for cancer and if you can get that information on the phone when something is life threatening as cancer, I should think if you choose to, you could get any other information on the phone as far as abortion or not to have an abortion or whatever is concerned.

*Id.* at 4.

After the opponents asserted that the "in the presence" requirement was intended as an "obstacle," the chief sponsor of the bill in the House defended the proposal:

Thank you, Mr. Speaker, members of the House. Real quickly, the purpose of this amendment is quite simply, somebody that's going to make a decision that is this important, you want to make sure that you're talking to the physician, the advanced practical nurse, the midwife or whomever is spelled out in this bill that that's the person you're talking to. I mean, the first time you may see this doctor, maybe on the operating table while you're already anesthetic and how do you know this is the doctor or the person you're supposed to be talking to. I mean, that is terrible consequence to rely on somebody you've never met before in your life and to take them at face value that this is the person who may be performing the operation or has the authority from the physician to talk to me over a telephone. That is very dangerous, especially when you're talking about the symptoms and consequences of an abortion. I would think you would want to talk personally to the person who may be performing that and know that they have—know that they are the person indeed that they are.

*Id.* at 4. The House then voted to adopt the amendment adding the "in the presence" requirement. The Senate eventually concurred with all House amendments, and the bill was enacted by overriding the Governor's veto.

No evidence before this court suggests that Indiana women seeking an abortion face a material risk of telephonic impersonation of health care professionals—the only purpose advanced in support of the "in the presence" requirement during the actual legislative debate.

Defendants suggest another purpose for the "in the presence" requirement—that "sound medical practice" recognizes the possible benefit of providing medical risk and fetal development information in person after an actual physical examination rather than over the telephone. See Def. Post-trial Br. at 18 ("The legislature could reasonably believe a face-to-face meeting would permit the physician to determine the gestational age of the fetus and the likely risks to the mother...."). Courts often indulge the assumption, without clear evidence, that legislators may have actually considered points that could support the constitutionality of a law. After all, what is important in a lawsuit may be different from what seemed immediately important in the thrust and parry of floor debate.

The problem with defendants' argument is that it requires reading into the lan-

guage of Public Law 187 a requirement that the person providing the information conduct a visual or physical examination of the woman when the mandated information is provided. No such requirement is stated in the statute. Additionally, the statute does not mandate that the required information be tailored to fit the individual medical needs of each woman. In fact, the evidence shows that plaintiffs use a "script" or a recording made by a physician in which the same information is provided to all women. See Tr. 7–9, 210; Ex. 364 at 11–12. There is no evidence tending to show how the "in the presence" requirement actually furthers the state's legitimate interests in maternal health or in protecting potential life.

In *Karlin v. Foust*, the Seventh Circuit considered the purpose prong of the undue burden test as applied to Wisconsin's informed consent statute, which is similar to Public Law 187. That statute required that a woman give her voluntary and written consent to an abortion, and that certain information be provided orally to a woman in person at least 24 hours prior to the abortion. Although the district court found certain provisions of the statute unconstitutional and therefore severed them from the statute, the court also found that the statute as a whole did not have the effect or purpose of imposing an undue burden on a woman's right to choose. See 188 F.3d at 457.

On appeal, the plaintiffs argued that the district court had erred in concluding that the statute did not have the purpose of imposing an undue burden on a woman's right to an abortion. The Seventh Circuit began its discussion of the purpose prong by reaffirming *Casey*'s holding that "a statute is considered to have an invalid purpose only if the means chosen by the state to further its legitimate interests in protecting potential life and maternal health are calculated to hinder a woman's free choice, rather than to inform it." *Id.* at 493, citing *Casey,* 505 U.S. at 877–78, 112 S.Ct. 2791. The court then noted that

the joint opinion in *Casey* and the Supreme Court's later decision in *Mazurek v. Armstrong,* 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997), "suggest that such a challenge will rarely be successful, absent some sort of explicit indication from the state that it was acting in furtherance of an improper purpose." *Karlin,* 188 F.3d at 493. The court explained:

> It is reasonable to conclude that the Court's decision [in *Casey* ] not to engage in any inquiry into the Pennsylvania statute's purpose indicates that the nature and structure of that statute's provisions coupled with the express indication of the Pennsylvania legislature contained in the Pennsylvania statute's purpose section, were more than sufficient to show that the statute was passed with a proper purpose or purposes in mind. *Casey* would seem to indicate that the Court would not scrutinize too closely the stated purpose or purposes of a regulation given the state's legitimate interest from the outset of a woman's pregnancy in persuading women to choose childbirth over abortion *as long as the regulation was reasonably designed to further that interest.*

*Id.* at 493 (internal citations omitted) (emphasis added). The Seventh Circuit noted that *Mazurek* "suggests that plaintiffs challenging abortion statutes will face significant difficulty in showing that an otherwise constitutional abortion regulation was enacted with an improper purpose." *Id.* at 494.

Defendants point out here that there has been no "explicit indication" from the state that it was acting in furtherance of an improper purpose. *Karlin* did not hold, however, and this court does not believe that *Casey* requires, that the legislature must admit to an improper purpose before a court can find that a statute fails the purpose prong of the undue burden standard. See *Okpalobi v. Foster,* 190 F.3d 337, 355 (5th Cir.1999) (rejecting the view that, "for a court to hold that a measure

has the impermissible purpose of placing an undue burden on a woman's right to an abortion, the legislature actually has to admit to such a purpose"), *vacated on other grounds*, 244 F.3d 405 (5th Cir.2001) (*en banc*). Nevertheless, the court need not reach a final conclusion as to whether the evidence in this case shows an improper purpose for the "in the presence" requirement. The evidence of the law's likely effects clearly shows that the law will impose an undue burden on women and their constitutional right to choose to end a pregnancy. The "in the presence" requirement is unconstitutional because of its effects. The court need not try to divine its purpose.

### VI. *Equal Protection Analysis*

Plaintiffs have argued that the "in the presence" requirement of Public Law 187 also violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against women. It is difficult to imagine legislation regulating abortions or access to them that does not affect women more than men. That much has been clear since long before *Roe v. Wade.* In light of all the attention devoted to litigating abortion rights under the Due Process Clause, the court does not see a basis for applying any different standard by invoking the Equal Protection Clause. The court therefore concludes that the Equal Protection theory adds nothing to plaintiffs' case and declines to address it further.

### VII. *Severability and Injunctive Relief*

The court concluded in 1997 that the "in the presence" requirement was severable from the rest of Public Law 187. *A Woman's Choice*, 980 F.Supp. at 974. Plaintiffs have indicated they do not seek to revisit that issue. Pl. Post-trial Br. at 6 n. 4. The court remains of the view that the "in the presence" requirement is severable. Accordingly, the court will enter a final judgment with a permanent injunction enjoining the defendant class from enforcing the

"in the presence" requirement. The remaining provisions of Public Law 187, in light of their construction by the Supreme Court of Indiana, will remain in effect.